In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 17-13595

_____

UNITED STATES OF AMERICA,

                                        Interested Party-Appellant,

*versus*

SECRETARY FLORIDA AGENCY FOR HEALTH CARE
ADMINISTRATION,
in her official capacity,
STATE SURGEON GENERAL,
in his official capacity as the State Surgeon General and Secretary
of the Florida Department of Health,
KRISTINA WIGGINS,
in her official capacity as Deputy Secretary of the Florida Depart-
ment of Health and Director of Children's Medical Services,
STATE SURGEON GENERAL JOHN ARMSTRONG, MD,
DEPUTY SECRETARY DR. CELESTE PHILIP, et al.,

2                                                                    17-13595

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:12-cv-60460-WJZ

_____

Before WILLIAM PRYOR, Chief Judge, WILSON, JORDAN, JILL PRYOR, NEWSOM, BRANCH, GRANT, LUCK, LAGOA, and BRASHER, Circuit Judges.*

BY THE COURT:

A petition for rehearing having been filed and a member of this Court in active service having requested a poll on whether this case should be reheard by the Court sitting en banc, and a majority of the judges in active service on this Court having voted against granting rehearing en banc, it is ORDERED that this case will not be reheard en banc.

_____

* Judge Robin Rosenbaum recused herself and did not participate in the en banc poll.

17-13595 JILL PRYOR, J., respecting denial of reh'g en banc        3

JILL PRYOR, Circuit Judge, respecting the denial of rehearing en banc:

I was a member of the panel majority. We held that the Attorney General of the United States may bring a lawsuit against the State of Florida to enforce Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–65. Judge Newsom dissents from the denial of rehearing en banc because, in his view, nothing in the ADA authorized the Attorney General to sue Florida in this case. Judge Branch dissented from the panel majority opinion on one of the two grounds Judge Newsom raises today. I write to respond to my dissenting colleagues' arguments that the panel erred in interpreting the statutory scheme.

★ ★ ★

The United States maintains that Florida administers its Medicaid program in a way that forces children with severe medical conditions into nursing homes to receive medical services necessary for their survival. As a result, these medically-fragile children often are placed in institutions hours away from their families, where they allegedly "spend most of their days languishing in bed or in their wheelchairs, with no one interacting with them and nothing to do." 12-cv-60460 Doc. 509 at 3.[1]

---

[1] When the Attorney General initially filed this action, it was assigned case number 0:13-cv-61576. The case later was consolidated with a separate civil action filed by several medically-fragile children, *A.R. v. Dudek*, and assigned case number 0:12-cv-60460. I use "13-cv-61576 Doc." to refer to the district

4          JILL PRYOR, J., respecting denial of reh'g en banc 17-13595

The United States Attorney General filed this lawsuit against the State of Florida under Title II of the ADA to vindicate the medically-fragile children's rights. The Attorney General claimed that Florida discriminated based on the children's disabilities because, although it would be possible for the children to receive the services they need while living with their families or guardians, Florida administered and funded its Medicaid program in such a way that the children can receive the services only in institutionalized settings. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587 (1999) (holding that a state engages in disability discrimination if it institutionalizes individuals with disabilities when community-based placement could be reasonably accommodated, accounting for the resources available to the state and the needs of others with disabilities.).

The question in this appeal is whether Title II of the ADA authorized the Attorney General to bring this lawsuit against the State of Florida. Title II generally prohibits state governments and agencies from discriminating based on disability. *See* 42 U.S.C. §§ 12131(1), 12132. Its enforcement provision states that "the remedies, procedures, and rights . . . provide[d] to any person alleging discrimination on the basis of disability" under § 12132 shall be the "remedies, procedures, and rights set forth in section 794a of Title 29." *Id.* § 12133.

---

court's docket entries in the original case and "12-cv-60460 Doc." to refer to the district court's docket entries in the consolidated case.

Given the enforcement provision's incorporation by reference, we can answer the central question of statutory interpretation here—whether the remedies, procedures, and rights available to a person alleging discrimination include suit by the Attorney General to vindicate the disabled person's rights—only after identifying the remedies, procedures, and rights available under not one, but, as it turns out, two earlier civil rights statutes. In its opinion, the panel majority painstakingly followed this chain of statutory references. After careful review of Title II's text, the enforcement schemes incorporated by reference, and the entire statutory scheme in context, the panel majority concluded that suit by the Attorney General was indeed a remedy, procedure, or right available to a person alleging discrimination under Title II.

Title II's enforcement provision incorporates by reference the remedies, procedures, and rights available to a person alleging discrimination under section 794a of Title 29, which is the Rehabilitation Act—an earlier civil rights statute that prohibits disability discrimination in connection with "any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). But when we look for the remedies, procedures, and rights available to a person alleging discrimination under the Rehabilitation Act, we find a reference to another statute, this one incorporating the remedies, procedures, and rights available under Title VI of the Civil Rights Act of 1964. *See id.* § 794a(a)(2). Title VI of the Civil Rights Act, an even earlier civil rights statute, similarly prohibits discrimination by or in "any program or activity receiving Federal financial assistance."

6          JILL PRYOR, J., respecting denial of reh'g en banc 17-13595

42 U.S.C. § 2000d. Under Title VI, though, the targeted discrimination is that based on race, color, or national origin. *Id.*

As the panel majority explained, the remedies, procedures, and rights available to a person alleging discrimination under Title VI of the Civil Rights Act include pursuing federal administrative procedures that may culminate in a lawsuit by the Attorney General to vindicate the protected rights. The panel majority determined that the remedies, procedures, and rights available to a person alleging discrimination under Title II likewise include a robust administrative scheme that may culminate in suit by the Attorney General on the person's behalf. The panel majority thus held that the Attorney General could sue Florida, on behalf of the medically-fragile children, under Title II for disability discrimination. *See United States v. Florida*, 938 F.3d 1221, 1250 (11th Cir. 2019).

In his dissental,[2] Judge Newsom advances an interpretation of Title II that would disallow suits by the Attorney General against states or state agencies to enforce rights of people with disabilities, despite the fact that such suits have long been used to enforce the Rehabilitation Act, Title VI, and Title II itself. Judge Newsom argues that the panel majority's holding was wrong because (1) the Attorney General cannot sue because he is not a "person" for purposes of the ADA and thus is afforded no remedies, procedures, or

---

[2] I use the term "dissental" to refer to Judge Newsom's dissent from the denial of rehearing en banc to distinguish it from Judge Branch's dissent from the panel majority's opinion.

17-13595 JILL PRYOR, J., respecting denial of reh'g en banc          7

rights under Title II's enforcement provision, and (2) the remedies, procedures, and rights available to the medically-fragile children under Title II do not include the Attorney General's suing Florida on their behalf because the Attorney General may sue a state or state agency to enforce Title II only when the state or state agency receives federal funding and agrees as a condition of the funding to refrain from engaging in disability discrimination. By permitting the Attorney General to sue states when Congress has not authorized such suits, he says, the panel opinion offends principles of federalism. As I explain below, none of these arguments is persuasive.

The dissental's first argument—that the Attorney General does not qualify as a "person" for purposes of the ADA—either takes aim at a strawman or rests on a misunderstanding of the panel opinion and the Attorney General's role in this lawsuit. The panel never suggested, much less held, that the Attorney General was the "person" referred to in § 12133. Rather, the panel concluded that the person referred to in § 12133 is the individual who claims to have suffered discrimination. Under Title II and its supporting regulations, this individual is afforded a panoply of remedies, procedures, and rights, including the right to file an administrative complaint against any public entity that engages in discrimination—a process that may culminate in suit by the Attorney General against the public entity on the individual's behalf. Because the Attorney General brings this lawsuit on behalf of a person alleging discrimination, the dissental's (and the dissent's) arguments about why the

8          JILL PRYOR, J., respecting denial of reh'g en banc 17-13595

Attorney General does not qualify as a "person" under § 12133 miss the mark entirely.

The dissental's second argument—that the remedies, procedures, and rights available to a disabled person do not include enforcement via suit on her behalf by the Attorney General against a public entity that receives no federal funding—warrants closer attention. But this argument, too, is unavailing. The statutory text, when read in context, permits the Attorney General to sue to enforce Title II's prohibition on disability discrimination by public entities, regardless of whether the public entity receives federal funding and agrees as a condition of that funding not to engage in disability discrimination. Indeed, unlike its predecessor statutes, which contained an express federal-funding limitation, Title II contains no reference to federal funding, and, as Judge Newsom concedes, its implied private right of action is not limited to federally-funded defendants.

The dissental argues lastly that the panel opinion offends principles of federalism. This argument rests entirely on the dissental's assumption that Congress did not authorize the Attorney General to sue states or state agencies for discrimination when the discrimination occurred in connection with a program or activity that did not receive federal funding. Because Congress did in fact authorize the Attorney General to sue any public entity for discrimination in violation of Title II, there is no federalism problem here.

17-13595 JILL PRYOR, J., respecting denial of reh'g en banc        9

Before addressing the dissental's arguments, I begin by providing an overview of the ADA and Title II. I then respond to the dissental's arguments in turn.

## I.    Overview of Title II of the ADA

Congress enacted the ADA "after decades of deliberation and investigation into the need for comprehensive legislation to address discrimination against persons with disabilities." *Tennessee v. Lane*, 541 U.S. 509, 516 (2004). Congress etched into the ADA's text the findings from its thorough investigation. *See* 42 U.S.C. § 12101(a).

The statutory text observes that "historically, society tended to isolate and segregate individuals with disabilities." *Id.* § 12101(a)(2). Despite the passage of legislation like the Rehabilitation Act, which effected "some improvements" in the treatment of individuals with disabilities, Congress found that disability discrimination "continue[d] to be a serious and pervasive social problem." *Id.* Discrimination against individuals with disabilities "persist[ed]" in "critical areas" including "housing . . . education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services." *Id.* § 12101(a)(3). Individuals with disabilities were subjected not only to "outright intentional exclusion" but also to "segregation" and "relegation to lesser services, programs, activities, [and] benefits." *Id.* § 12101(a)(5). Individuals with disabilities "often had no legal recourse to redress such discrimination." *Id.* § 12101(a)(4).

10        JILL PRYOR, J., respecting denial of reh'g en banc 17-13595

After setting out these findings about the scope of the disability-discrimination problem, Congress expressed its intent in enacting the ADA: to combat the problem by establishing "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Id.* § 12101(b)(1). The ADA would prevent such discrimination by creating "clear, strong, consistent, [and] enforceable standards" to "address the major areas of discrimination faced day-to-day by people with disabilities." *Id.* § 12101(b)(2), (4). Lest any doubt remain, the text spelled out the ADA's central purpose: "to ensure that the *Federal Government plays a central role in enforcing* the standards established" under *the ADA "on behalf of individuals with disabilities*." *Id.* § 12101(b)(3) (emphasis added).

Consistent with its broad remedial purpose, the ADA's three titles bar different types of entities from engaging in disability discrimination: Title I applies to employers, Title II applies to public entities, and Title III applies to places of public accommodation. As I explain below in section III-A below, although Congress authorized the Attorney General to bring a suit to enforce each title, it structured each title's enforcement provision—the provision that authorizes the Attorney General to sue—in a different way. *See id.* §§ 12117(a), 12133, 12188(b).

17-13595 JILL PRYOR, J., respecting denial of reh'g en banc    11

I turn now to Title II,[3] as this case concerns alleged discrimination by a public entity. Under Title II, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* § 12132. A "public entity" includes "any State or local government" as well as "any department [or] agency . . . of a State . . . or local government." *Id.* § 12131(1)(A), (B).

Importantly, its passage of Title II was not the first time Congress acted to prohibit public entities from engaging in disability discrimination. The Rehabilitation Act already barred disability discrimination by programs or activities operated by state or local governments. *See* 29 U.S.C. § 794(a). But, by its express terms, the Rehabilitation Act applies only to programs or activities that "receiv[e] [f]ederal financial assistance." *Id.* By contrast, Title II of the ADA extended the scope of protection afforded to individuals with disabilities by prohibiting *any* program run by a public entity from engaging in disability discrimination—it contains no reference to federal financial assistance or funding. *See* 42 U.S.C. §§ 12131(a); 12132; *see Shotz v. City of Plantation*, 344 F.3d 1161, 1174 (11th

---

[3] Title II is divided into two subchapters: subchapter A sets forth the general provisions that prohibit discrimination by public entities, and subchapter B pertains to discrimination in public transportation specifically. *See* ADA, Pub. L. No. 101-336 § 1, 104 Stat. 327, 327–28 (1990). Because subchapter B is not at issue in this case, I use "Title II" to refer to subchapter A.

12        JILL PRYOR, J., respecting denial of reh'g en banc 17-13595

Cir. 2003) ("The ADA makes *any* public entity liable for prohibited acts of discrimination, regardless of funding source.").

Section 12133 lays out how Title II's broad prohibition barring any public entity from engaging in disability discrimination is enforced. As I explained above, § 12133 provides that the "remedies, procedures, and rights" available to a person alleging disability discrimination under Title II are the "remedies, procedures, and rights" of the Rehabilitation Act, which in turn incorporates the "remedies, procedures, and rights" set out in Title VI of the Civil Rights Act of 1964. 42 U.S.C. § 12133; *see* 29 U.S.C. § 794a(a)(2). Under the Rehabilitation Act and Title VI, when a state or local public entity receiving federal funding engages in disability discrimination or race discrimination, respectively, the federal government may enforce compliance with the statute by terminating federal funding to the program or activity or taking "any other means authorized by law." 42 U.S.C. § 2000d-1; *see* 29 U.S.C. § 794a(a)(2). There is no dispute that, under these statutes, the "other means authorized by law" include the Attorney General's filing of an enforcement lawsuit against the public entity.

In another noteworthy provision of Title II, Congress addressed the creation of a regulatory scheme to enforce the statute's mandate. Section 12134 directs the Attorney General to promulgate regulations to implement § 12132's prohibition on discrimination by public entities. *Id.* § 12134(a). Congress instructed the Attorney General to adopt regulations "consistent . . . with the coordination regulations" under the Rehabilitation Act. *Id.* § 12134(b).

17-13595 JILL PRYOR, J., respecting denial of reh'g en banc       13

With this provision, Congress directed the Attorney General to create an administrative scheme through which individuals could file with federal agencies complaints alleging that a state or local public entity had engaged in discrimination, and the administrative proceedings could culminate in a lawsuit brought by the Attorney General against the public entity. We know this by once again following a series of references to enforcement schemes for earlier civil rights statutes. Section 12134 expressly refers to the Rehabilitation Act's coordination regulations, which already existed when Congress enacted the ADA. These regulations direct each federal agency to establish "a system for the enforcement of [the Rehabilitation Act's prohibition on disability discrimination] . . . with respect to the programs and activities to which it provides assistance." 28 C.F.R. § 41.5(a). According to the coordination regulations, each agency's enforcement system must incorporate the administrative scheme used to enforce Title VI of the Civil Rights Act, including "[t]he enforcement and hearing procedures." *Id.* § 41.5(a)(1). Under Title VI's administrative scheme, an individual alleging discrimination by a recipient of federal financial assistance files a complaint with a federal agency, which then investigates the complaint. *See id.* § 42.107(b)–(c). If the investigation reveals that discrimination occurred, the federal agency attempts to negotiate a resolution with the recipient of the federal financial assistance. *Id.* § 42.107(d)(1). If the agency is unable to negotiate a resolution, the Attorney General then may sue to enforce the prohibition on discrimination. *See id.* § 42.108(a).

14        JILL PRYOR, J., respecting denial of reh'g en banc 17-13595

Since Congress enacted the ADA more than 30 years ago, the federal government has routinely enforced Title II's prohibition on disability discrimination by state and local public entities. Federal agencies have frequently investigated and attempted to resolve through informal means complaints that state and local governments violated Title II. And the Attorney General has filed dozens of lawsuits against public entities in federal court to vindicate the rights of individuals with disabilities.[4]

## II.     The Dissental's Argument that the Attorney General Is Not a "Person" Is Irrelevant to the Question Whether the Attorney General Was Authorized to Sue Florida.

With this background about the relevant statutory scheme in mind, we turn to Judge Newsom's first argument. Echoing Judge Branch's panel dissent, Judge Newsom argues that the panel erred in holding that the Attorney General could sue under § 12133 because the Attorney General does not qualify as a "person alleging discrimination" under the ADA. 42 U.S.C. § 12133.

---

[4] *See, e.g.*, U.S. Dep't of Justice, ADA Enforcement, Cases 2006-Present, Title II, https://www.ada.gov/enforce_current.htm#TitleII (last visited Dec. 16, 2021); U.S. Dep't of Justice, ADA Enforcement, Cases 1992-2005, Title II, https://www.ada.gov/enforce_archive.htm#TitleII (last visited Dec. 16, 2021); U.S. Dep't of Justice, *Olmstead* Enforcement, https://www.ada.gov/olmstead/olmstead_enforcement.htm (last visited Dec. 16, 2021). Together these websites list the instances when the Attorney General has secured settlements from public entities or, when unable to negotiate resolutions, brought enforcement actions against them.

17-13595 JILL PRYOR, J., respecting denial of reh'g en banc        15

Judge Newsom's position rests on the assumption that in this case the Attorney General sued as a "person alleging discrimination" who is afforded remedies, procedures, and rights under Title II of the ADA. But this assumption is mistaken. When the Attorney General sues under Title II, the "person alleging discrimination" is the individual with a disability. One of the remedies, procedures, and rights afforded to this individual is that the Attorney General may sue to vindicate the individual's rights and to enforce federal law.

The record in this case confirms that the persons alleging discrimination were the medically-fragile children who allegedly were unnecessarily forced into institutions to receive necessary medical services. According to the complaint, the Attorney General brought the lawsuit "to enforce the rights of children" whom Florida had "discriminate[d] against" by subjecting them to "prolonged and unnecessary institutionalization." 13-cv-61576 Doc. 1 at 2. The remedies the Attorney General sought were to benefit the children. To that end, the Attorney General requested injunctive relief to end Florida's alleged practice of unnecessarily institutionalizing the children and monetary damages to compensate the children for injuries they allegedly suffered because of Florida's discriminatory conduct.

Throughout this litigation, the Attorney General has consistently maintained the position that the persons alleging discrimination are the children, not himself. As far I can tell, he has never taken the position in this case that he is the person alleging

16          JILL PRYOR, J., respecting denial of reh'g en banc 17-13595

discrimination under § 12133. In fact, he has expressly disavowed making such a claim. *See* Appellant's Br. at 25 (explaining that when the Attorney General files suit he is not the person alleging discrimination); Response to Petition for Reh'g En Banc at 2 (stating that the Attorney General "explicitly *disclaimed* the position that the Attorney General is a person alleging discrimination under Title II's enforcement provision" (emphasis in original) (internal quotation marks omitted)).[5] The record is unambiguous: the Attorney General sued under § 12133 on behalf of the medically-fragile

---

[5] The dissental asserts the Attorney General has in fact taken the position that he is the person referred to in the statute. As support, the dissental cites to the Attorney General's reply brief stating that when the Attorney General "files a Title II lawsuit, he proceeds on behalf of the United States—not as the attorney for any individual complainant." Reply Br. at 5. The dissental takes this statement out of context.

In its appellee's brief, the State of Florida argued that the Attorney General's filing of a lawsuit under the ADA is not a remedy, procedure, or right available to a person alleging discrimination. Florida contended that an individual with a disability had no "private right" to require the Attorney General to bring an enforcement action on his behalf because a federal agency "cannot be compelled to act on a complaint" filed by an individual. Appellee's Br. at 23–24. In reply, the Attorney General agreed that a victim of discrimination had "no 'right' *to compel* the Attorney General to file a lawsuit" on the victim's behalf because the Attorney General did not proceed "as the attorney for [the] individual complainant." Reply Br. at 4–5. Instead, the remedies, procedures, and rights available to a person alleging discrimination "include[d] a longstanding federal administrative enforcement scheme" that, *at the discretion of the Attorney General,* may culminate in the filing of a lawsuit by the United States government against a public entity to vindicate the individual complainant's rights. *Id.* at 5.

17-13595 JILL PRYOR, J., respecting denial of reh'g en banc        17

children who were the victims of disability discrimination—the persons alleging discrimination who may enforce Title II through the relevant remedies, procedures, and rights. So, the question of whether the Attorney General may qualify as a "person" under Title II is simply not raised by this case.

Setting this fact aside, the dissental argues at length that the Supreme Court's decision in *Return Mail, Inc. v. U.S. Postal Service*, 139 S. Ct. 1853 (2019), forecloses the idea that the Attorney General can himself qualify as a "person" alleging discrimination. *Return Mail* addressed whether the United States Postal Service ("USPS") may sue on *its own behalf*, to protect *its own rights*. Nowhere did the case address when a government official, such as the Attorney General, may sue on behalf of another person to enforce a federal statute protecting that person's rights.

In *Return Mail*, the Supreme Court confronted the question whether USPS could challenge an issued patent before the U.S. Patent and Trademark Office. *Id.* at 1858–59. After Return Mail sued USPS for infringing Return Mail's patented mail-sorting system, USPS filed a petition with the United States Patent and Trademark Office for review and cancellation of Return Mail's patent. *Id.* at 1861. In filing the application, USPS sought relief only for itself and not for any other person or party.

The Supreme Court considered whether the relevant federal statute, which permits a "person" to petition for review and cancellation of a patent, authorized USPS to bring a petition for review and cancellation. *See id.* (quoting 35 U.S.C. § 311(a)). As an agency

of the federal government, the Supreme Court held, USPS was not a "person" under the statute and could not bring a petition for review. *Id.* at 1867. The Court based its opinion on a long line of cases establishing a presumption that the sovereign is not a person. *See id.* at 1862–63.

Our panel majority opinion correctly concluded that *Return Mail* was distinguishable. The opinion reasoned that Title II's "complex" enforcement provision "differ[ed] significantly" from the simpler statutory scheme that the Court was addressing in *Return Mail. See Florida*, 938 F.3d at 1227 n.5. Unlike the statute in *Return Mail*, which permitted only "a person" to petition for review and cancellation of a patent, Title II's enforcement provision "provides" to "person[s] alleging discrimination" the "remedies, procedures, and rights" of the Rehabilitation Act and Title VI. 42 U.S.C. § 12133. Under these incorporated predecessor statutes, at least, it is clear that the Attorney General can sue on behalf of the aggrieved person, rather than as the person. *See Florida*, 938 F.3d at 1226–38.

In this case, the persons alleging discrimination under Title II and who are afforded "remedies, procedures, and rights" are the children who have been subjected to prolonged and unnecessary institutionalization. Because the Attorney General did not bring this lawsuit on his own behalf as the "person" described in § 12133, the panel majority opinion did not treat the Attorney General or federal government as a "person," and this case does not implicate the presumption addressed in *Return Mail*.

17-13595 JILL PRYOR, J., respecting denial of reh'g en banc        19

III.    The Dissental's Argument that the Attorney General May Sue to Enforce Title II Only When a Public Entity Receives Federal Funding Cannot Be Reconciled with the Statutory Text and Conflicts with Supreme Court Precedent.

The panel majority correctly concluded that under Title II the Attorney General is authorized to sue any public entity, regardless of whether it receives federal funding. There is no dispute in this case that Title II's enforcement provision incorporates by reference the remedies, procedures, and rights available to a person alleging discrimination under the Rehabilitation Act and Title VI of the Civil Rights Act. There is also no dispute that the remedies, procedures, and rights available under those earlier statutes include that the victim of discrimination may file an administrative complaint that may culminate in the filing of an enforcement action by the Attorney General on the victim's behalf. *See, e.g., United States v. Bd. of Trs. for Univ. of Ala.*, 908 F.2d 740, 742 (11th Cir. 1990) (suit brought by United States against state university to enforce Rehabilitation Act on behalf of individuals alleging discrimination by the university); *United States v. Marion Cnty. Sch. Dist.*, 625 F.2d 607, 608–09 (5th Cir. 1980) (suit brought by United States against school district to enforce Title VI on behalf of individuals alleging discrimination by the school district). Because the Attorney General had the authority to enforce the Rehabilitation Act and Title VI of the Civil Rights Act by bringing civil enforcement actions, the panel majority correctly concluded that Title II's

20          JILL PRYOR, J., respecting denial of reh'g en banc 17-13595

enforcement provision similarly authorized the Attorney General
to bring civil suits to vindicate the rights that Title II protects—
freedom from disability discrimination by state or local public en-
tities. *See Florida*, 938 F.3d at 1250.

Judge Newsom argues that the Attorney General's authority
to sue a public entity to enforce the Rehabilitation Act or Title VI
of the Civil Rights Act arises from the fact that the public entity
agreed as a condition of receiving federal funding not to engage in
discrimination. So, he says, the Attorney General's authority to sue
to enforce Title II must be similarly limited. In Judge Newsom's
view, the Attorney General can sue a public entity only when it
receives federal funding and expressly agrees as a condition of the
funding not to engage in disability discrimination.

This argument has some appeal. Ultimately, though, it too
is flawed. The dissental adopts an interpretation that reads Title II's
enforcement provision in isolation instead of reading the statutory
text in context. Moreover, the dissental's interpretation would lead
unavoidably to a result the Supreme Court has rejected: that an
individual would have an implied private right of action under Title
II to sue a public entity that receives no federal funding, yet the
federal government would have no corresponding enforcement
authority.

17-13595 JILL PRYOR, J., respecting denial of reh'g en banc        21

### A. The Dissental's Interpretation Cannot Be Reconciled with the Statutory Text When Read in Context.

Judge Newsom says his conclusion that the Attorney General may sue to enforce Title II only when a public entity agrees as a condition of federal funding not to engage in disability discrimination is consistent with the relevant statutory text. But his interpretation runs afoul of basic principles of statutory construction because it ignores statutory context.

The question of whether the Attorney General may sue to enforce Title II is a question of statutory interpretation. When we interpret a statute, we must begin "with the words of the statutory provision." *Harris v. Garner*, 216 F.3d 970, 972 (11th Cir. 2000) (en banc). But "[s]tatutory language has meaning only in context." *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 415 (2005); *see Wachovia Bank, N.A. v. United States*, 455 F.3d 1261, 1267 (11th Cir. 2006) ("[C]ontext is king."). In interpreting a statute, "we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 18 (1981) (internal quotation marks omitted); *see Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").

22      JILL PRYOR, J., respecting denial of reh'g en banc 17-13595

Here, the statutory text, when read in context, reflects that Congress intended to authorize the Attorney General to bring a lawsuit to enforce Title II against any public entity, regardless of whether it obtained federal funding. In Title II, by expressly importing the remedies, procedures, and rights available under the Rehabilitation Act and Title VI of the Civil Rights Act, Congress ratified and incorporated into Title II administrative procedures that may culminate in an enforcement action by the Attorney General. Unlike the earlier statutes, which are expressly limited to addressing discrimination by public entities that receive federal funding, however, Title II regulates against all public entities, with no mention of federal funding. Thus, none of Title II's remedies, procedures and rights—of which suit by the United States government is one—are so limited.

"Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs." *Lane*, 541 U.S. at 524. This pattern of disability discrimination persisted despite Congress's efforts to address it. *See id.* at 525–26. The earlier legislative efforts included the Rehabilitation Act, which prohibited disability discrimination by state and local governments. But because Congress enacted the Rehabilitation Act pursuant to its Spending Clause power, the Rehabilitation Act's prohibition was limited to state and local governments that operated a program or activity receiving federal financial assistance. *See* 29 U.S.C. § 794(a). The limited reach of the Rehabilitation Act's prohibition on discrimination by state and local government

17-13595 JILL PRYOR, J., respecting denial of reh'g en banc        23

rendered it "inadequate to address the pervasive problems of discrimination that people with disabilities [were] facing." *Lane*, 541 U.S. at 526 (internal quotation marks omitted).

Congress adopted Title II to remedy this inadequacy by extending the prohibition on disability discrimination to reach any program or activity of a state or local government, not merely those that receive federal funding. This is no novel insight by the panel majority. Our court recognized nearly two decades ago that "an integral purpose of [Title] II" was to make the Rehabilitation Act's prohibition on discrimination applicable to "all programs, activities, and services provided or made available by state and local governments . . . , *regardless of whether or not such entities receive Federal financial assistance.*" *Shotz*, 344 F.3d at 1174 (emphasis added) (internal quotation marks omitted).

The text of Title II supports this understanding. It states that "no qualified individual with a disability shall, by reason of such disability, . . . be subjected to discrimination by *any* [public] entity." 42 U.S.C. § 12132 (emphasis added). Title II broadly defines a public entity to include "*any* State or local government," with no requirement that the entity receive federal funding. *Id.* § 12131(1)(A) (emphasis added). Because of this broad language, Judge Newsom must concede that Title II permits an individual to sue any public entity for disability discrimination, regardless of whether it receives federal financial assistance, yet his interpretation imposes an atextual limitation on the other avenue of relief under the statute.

24        JILL PRYOR, J., respecting denial of reh'g en banc 17-13595

Both textual and contextual clues reveal that Title II was Congress's response to the shortcomings of the Rehabilitation Act, which prohibited public entities from engaging in disability discrimination only to the extent they received federal funding. Title II was meant to fill the gap by expanding the prohibition on disability discrimination to all state governmental entities, regardless of whether the state program or activity said to be discriminatory receives federal funding. The dissental's interpretation of § 12133 fails because it carries forward into Title II the very limitations of the Rehabilitation Act that Congress intended Title II to remedy.

The dissental magnifies its error by ignoring § 12134. Section 12134 of Title II instructs the Attorney General to promulgate regulations to create an administrative enforcement framework, directing that the regulations must be "consistent" with the regulations promulgated under the Rehabilitation Act (and, by incorporation, Title VI of the Civil Rights Act). *Id.* § 12134(b). As I explained above, the regulations promulgated under the Rehabilitation Act and Title VI of the Civil Rights Act create a robust administrative process in which federal agencies investigate and attempt to resolve, through informal means, claims alleging disability discrimination by public entities and, if the investigating agency is unable to resolve the claim, the Attorney General may sue the public entity. *See* 28 C.F.R. §§ 41.5(a)(1); 42.107(b)–(d); 42.108.

I cannot square the dissental's interpretation, which leaves the Attorney General without any authority to enforce Title II against public entities that receive no federal funding, with

17-13595 JILL PRYOR, J., respecting denial of reh'g en banc        25

Congress's direction in § 12134 that Title II's prohibition on discrimination should be enforced through a robust administrative scheme. Under the dissental's interpretation, upon receiving a complaint that a non-federally-funded public entity has discriminated against a person with a disability, a federal agency pours resources into investigating the complaint and attempting to reach an informal settlement. But if that process ultimately proves unsuccessful, the federal government must give up—because it may not sue the public entity to enforce the law. Without any enforcement teeth, such a regulatory process would be utterly ineffectual.

Lastly, the dissental's narrow interpretation of the Attorney General's enforcement authority conflicts with Congress's express legislative findings about the ADA's purpose. By leaving the federal government with no enforcement power when unlawful disability discrimination is perpetrated by a public entity that receives no federal funding, the dissental's interpretation undermines Congress's intention for the ADA to serve as "comprehensive" legislation to address the continuing problem of disability discrimination, which persisted across all dimensions of a disabled person's life, including "access to public services." 42 U.S.C. § 12101(a)(3), (b)(1). This interpretation also undermines Congress's expressed intent for the ADA to set forth "consistent" standards prohibiting the disability discrimination and to give the federal government "a central role"

26        JILL PRYOR, J., respecting denial of reh'g en banc 17-13595

in enforcing the prohibition on disability discrimination. *Id.*
§ 12101(b)(2)–(3).[6]

The dissental's interpretation effectively treats the ADA, like
the earlier Rehabilitation Act, as a Spending Clause statute in which
Congress regulated state and local governments only where they
receive federal funding. As we previously explained in *Shotz*, this
interpretation makes little sense. The types of conduct that consti-
tute discrimination under the Rehabilitation Act and Title II are so
similar that if Congress had intended for Title II's provisions to ap-
ply only to federal funds recipients, "it would have been far easier
to amend the Rehabilitation Act to account for the minor differ-
ences between it and [Title] II of the ADA than to insert an other-
wise unnecessary [title] in the ADA itself." *Shotz*, 344 F.3d at 1174.
Rather, in enacting the ADA, Congress expressly "invoke[d] the

---

[6] I pause to address my reliance on § 12101. Our court has warned against
adopting an interpretation of a statute that relies solely on a statement of leg-
islative purpose, saying "it is hornbook abuse of the whole-text canon to argue
that since the overall purpose of the statute is to achieve *x*, any interpretation
of the text that limits the achieving of *x* must be disfavored." *Regions Bank v.
Legal Outsource PA*, 936 F.3d 1184, 1194–95 (11th Cir. 2019) (internal quota-
tion marks omitted). But my argument here is different. The text of Title II
itself tells us that Congress intended to extend the prohibition against disability
discrimination to all public entities by eliminating the distinction among pub-
lic entities based on their receipt of federal funding. I look to the statements of
purpose in § 12101 only for additional support. The Supreme Court has en-
dorsed this approach in the context of this very statutory scheme. *See
Olmstead*, 527 U.S. at 599–600 (looking to substantive provisions in Title II as
well as the findings in § 12101 when construing the term "discrimination" in §
12132).

sweep of [its] authority, including the power to enforce the four-teenth amendment and to regulate commerce" so that it could "ad-dress the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. § 12101(b)(4).

The dissental fails to grapple with these problems in its in-terpretation. Instead, it attacks the panel majority's reasoning by pointing to differences between the enforcement provision in Title II of the ADA and the enforcement provisions in Titles I and III. It says that because Titles I and III expressly authorize the Attorney General to sue, the absence of a similar provision in Title II must mean that Congress did not intend for the Attorney General to be able to sue under Title II. But the dissental overlooks an important piece of the puzzle: with each title of the ADA, Congress was leg-islating upon a different existing statutory framework. Thus, the different language Congress used in the enforcement provisions of each title merely reflects the different approaches that Congress took to incorporate existing law; it does not reflect different reme-dies. Judge Newsom never confronts this nuance.

I begin with Title I, which concerns employment claims. *See* 42 U.S.C. § 12112(a). Title I's enforcement provision states, "[t]he powers, remedies, and procedures set forth in sections 2000e-4, 2000e-5, 2000e-6, 2000e-8, and 2000e-9 of this title shall be the pow-ers, remedies, and procedures this subchapter provides to the [Equal Employment Opportunity] Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability." *Id.* § 12117(a). Although this provision bears some

28        JILL PRYOR, J., respecting denial of reh'g en banc 17-13595

resemblance to Title II's enforcement provision, there are two important differences. First, Title II's enforcement provision speaks to the "remedies, procedures, and rights" available, *id.* § 12133, whereas Title I addresses "powers, remedies, and procedures," *id.* § 12117(a). Second, the relevant actors are treated differently in the two statutes. Title II's enforcement provision incorporates the parts of the Rehabilitation Act and Title VI that set forth the remedies, procedures, and rights of a "person alleging discrimination," *id.* § 12133, whereas Title I's enforcement provision incorporates portions of Title VII of the Civil Rights Act of 1964 that set forth the powers, remedies, and procedures provided to the EEOC, the Attorney General, or a person alleging discrimination, *id.* § 12117(a).

These two differences indicate that sections 12133 and 12117 serve overlapping, but not identical, purposes. Although both provisions incorporate other statutes setting out the remedies available to a person alleging discrimination, § 12117 also incorporates provisions from Title VII addressing how power to enforce Title VII is shared between the EEOC and the Attorney General. As the Attorney General explains, "[b]ecause the point of [§] 12117(a) was to make clear that the same division of authority among the various actors under the five different sections of Title VII [of the Civil Rights Act] applies to Title I of the ADA, it was only natural that Congress would avoid confusion by specifying the actors among whom the authority is divided." Appellant's Br. at 28-29. No similar reference to the Attorney General (or the EEOC) was needed in

Title II because the pre-existing statutes that Congress was incorporating there had simpler enforcement schemes that did not involve the sharing of "powers," 42 U.S.C. § 12117(a), between the Attorney General and the EEOC.

Judge Newsom argues that the differences between Title I and Title II support his position because Title I's enforcement provision shows that Congress knew how to expressly reference the Attorney General when necessary. He is correct, of course, that "[w]here 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" Dissental at 46 (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). But the general presumption is overcome here. The differences between the enforcement provisions in Title I and Title II and, importantly, the earlier statutes they each incorporate suffice to explain why Congress would mention the Attorney General in Title I but not in Title II. "The *Russello* presumption—that the presence of a phrase in one provision and its absence in another reveals Congress'[s] design—grows weaker with each difference in the formulation of the provisions under inspection." *Clay v. United States*, 537 U.S. 522, 532 (2003) (internal quotation marks omitted).

I now turn to Judge Newsom's similar argument about Title III. Title III prohibits discrimination against a person "on the basis of disability in the full and equal enjoyment of . . . any place of public accommodation." 42 U.S.C. § 12182(a). Title III's enforcement

30        JILL PRYOR, J., respecting denial of reh'g en banc 17-13595

provision is structured differently than the enforcement provisions in either Title I or Title II.

Title III's enforcement provision is § 12188. Subsection (a) of § 12188 gives an individual who was subjected to discrimination a private right of action to sue the operator of a place of public accommodation. In § 12188(a), Congress established this private right of action through an incorporation by reference: "The remedies and procedures set forth in section 2000a-3(a) [Title II of the Civil Rights Act of 1964] are the remedies and procedures this subchapter provides to any person who is being subjected to discrimination on the basis of disability." *Id.* § 12188(a). In an action under § 12188(a), the aggrieved person may seek only "preventive relief," such as a permanent or temporary injunction or restraining order. See *id.* § 2000a-3(a).[7] The aggrieved person may not recover damages.

In subsection (b) of § 12188, however—without incorporating remedies from any other statute—Congress expressly authorized "the Attorney General [to] commence a civil action." *Id.* § 12188(b)(1)(B). In contrast to the private right of action under subsection (a), in an action brought by the Attorney General under subsection (b), the court may award, in addition to equitable relief such as temporary, preliminary, or permanent injunctive relief,

---

[7] In addition, a prevailing party may recover its reasonable attorney's fees. *See* 42 U.S.C. § 2000a-3(b)

damages to any "persons aggrieved" or may assess a civil penalty. *Id.* § 12188(b)(2).

Section 12188(b) is unique among the ADA's three titles because it is the only enforcement provision in which Congress expressly authorized the Attorney General to commence an action instead of incorporating by reference an enforcement provision from another statute. Why? Because in Title III Congress was creating a brand-new remedy, one which did not exist in earlier statutes, available to the Attorney General to combat discrimination by operators of places of public accommodation. Although Title II of the Civil Rights Act of 1964 allowed the Attorney General to sue an operator of a place of public accommodation who engaged in discrimination, the Attorney General could seek only injunctive relief, not damages or a penalty. *See, e.g.*, *id.* § 2000a-5(a) (permitting Attorney General to bring civil actions seeking injunctive relief, not damages). Because Title III of the ADA created a new, expanded role for the Attorney General, it necessarily had to describe that role rather than incorporating an earlier provision by reference.[8]

---

[8] Judge Newsom lists several other federal statutes where Congress expressly authorized the Attorney General to commence an action to enforce the statute. But it is not the case, of course, (and Judge Newsom stops short of saying) that Congress *must* include such express language to authorize the Attorney General to sue. If Congress *had* to include such express language, then the Attorney General would have no authority to enforce the Rehabilitation Act (because its enforcement provision incorporates by reference the remedies, procedures, and rights of Title VI of the Civil Rights Act) even against public entities that receive federal funding. *See* 29 U.S.C. § 794a(a)(2).

32          JILL PRYOR, J., respecting denial of reh'g en banc 17-13595

When viewed in context, the enforcement provisions in the ADA demonstrate that Congress took two different approaches in setting out the remedies available for a violation of the ADA, and there were good reasons for taking those different approaches. As one approach, Congress incorporated by reference the enforcement provision of an existing civil rights statute to incorporate the remedies available under the earlier statute, as it did in Titles I and II.[9] For another approach, Congress included rights-creating language to expressly authorize the Attorney General to sue, as it did in Title III. Therefore, I cannot agree with the dissental that the rights-creating language in § 12188(b), which expressly authorizes the Attorney General to sue to enforce Title III, indicates that Congress did not intend to authorize the Attorney General to sue under Title II to enforce the rights of victims of discrimination. The dissental's interpretation flies in the face of Congress's incorporation by reference of the existing enforcement provisions in the Rehabilitation Act and Title VI of the Civil Rights Act, both of which give the Attorney General the right to sue on behalf of victims of discrimination. The panel majority correctly interpreted the statutory

---

[9] Although Titles I and II are similar in that Congress incorporated by reference the enforcement provisions of existing statutes, I explained above that other differences in the relevant statutory schemes explain why Congress expressly mentioned the Attorney General in Title I but not in Title II. Unlike in Title II, where Congress was simply extending the reach of existing remedies to public entities regardless of whether they receive federal funding, in Title I Congress was dealing with a complex statutory scheme with multiple actors sharing enforcement roles.

17-13595 JILL PRYOR, J., respecting denial of reh'g en banc        33

text as permitting the Attorney General to sue any public entity for disability discrimination.

## B.  *The Dissental's Interpretation Conflicts with Supreme Court Precedent.*

Another glaring problem with the dissental's interpretation warrants mention: it creates a situation where an individual alleging disability discrimination has an implied private right of action against a public entity that receives no federal funding under Title II, but the federal government has no corresponding enforcement authority. I have difficulty squaring this result with the Supreme Court's decision in *NCAA v. Smith*, where the Court explained that when a civil rights statute, such as Title II of the ADA, creates an implied right of action to sue, the implied private right of action is no broader than the federal government's authority to enforce that statute. 525 U.S. 459, 467 n.5 (1999).

To put this explanation in context, we need to review what happened in *Smith*. An athlete alleged that the NCAA discriminated against her on the basis of sex when it denied her permission to play intercollegiate volleyball. *Id.* at 462. She sued the organization under Title IX, which prohibits discrimination on the basis of sex in "any education program or activity receiving Federal financial assistance." *Id.* (quoting 20 U.S.C. § 1681(a)). The question before the Supreme Court was whether the NCAA received federal funding. Although the NCAA itself received no direct federal funding, the athlete argued that she could sue the organization under

Title IX because it received dues payments from its member universities, which did receive federal financial assistance. *Id.* at 464. The Supreme Court rejected the athlete's argument.

In concluding that the NCAA could not be sued under Title IX, the Supreme Court relied on its earlier decision in *U.S. Department of Transportation v. Paralyzed Veterans of America. See id.* at 467 (citing 477 U.S 597, 603–12 (1986)). In *Paralyzed Veterans*, the Court considered whether the Rehabilitation Act permitted a federal agency to prohibit commercial airlines from discriminating based on disability. *See* 477 U.S. at 604. The commercial airlines received no funding directly from the federal government, but the plaintiffs argued that the Act authorized the federal government to regulate the airlines because they indirectly benefited from the federal funding airports received. *Id.* at 606. The Supreme Court disagreed, holding that the Rehabilitation Act permitted the federal government to regulate only actual recipients of federal funds. *Id.* at 606–07.

The athlete in *Smith* had tried to distinguish *Paralyzed Veterans* on the ground that it "involved a Government enforcement action," whereas she had brought a "private suit." *Smith*, 525 U.S. at 467 n.5. The athlete's argument hinged on the premise "that the private right of action available under" Title IX was "potentially broader than the Government's enforcement authority" under Title IX. *Id.*

The Court said no. It explained that there was "no express authorization for private lawsuits in Title IX" and that Congress

17-13595 JILL PRYOR, J., respecting denial of reh'g en banc        35

had instead authorized an implied private right of action. *Id.* "[I]t would be anomalous," the Court said, "to assume that Congress intended the implied right of action to proscribe conduct that Government enforcement may not check." *Id. Smith* teaches that when Congress creates an implied private right of action to sue for civil rights violations, the private right of action and the federal government's enforcement authority are coextensive.

Judge Newsom's position mirrors the argument the athlete made, and the Court rejected, in *Smith*. He acknowledges that an individual may file suit for discrimination prohibited by Title II against any public entity but maintains that the government may enforce Title II's prohibition against only those public entities that receive federal funding. Thus, under his interpretation of Title II, an individual's implied private right of action is broader than the government's enforcement authority.[10]

But in *Smith* the Court rejected the idea that the private right of action could be broader than this enforcement authority when it said such a result would be "anomalous." *Id.* Although theoretically it might be possible for Congress to enact a civil rights statute giving individuals an implied private right of action to sue

---

[10] Although *Smith* involved a different civil rights statute, Title IX's enforcement provision—like Title II's—was patterned on Title VI's enforcement provision. *Compare* 20 U.S.C. § 1682, *with* 42 U.S.C. § 2000d-1. We have declared Title IX case law to be "informative" in interpreting the Rehabilitation Act because both statutes were "modeled after Title VI." *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 346 (11th Cir. 2012).

36　　　JILL PRYOR, J., respecting denial of reh'g en banc 17-13595

but leaving the Attorney General without corresponding authority to enforce against the prohibited conduct, Judge Newsom has identified no statute that has been interpreted this way.[11]

---

[11] Judge Newsom tries to ameliorate the impact of his reading of Title II by suggesting that even if the Attorney General lacks the authority to sue Florida under Title II, the United States could vindicate the children's rights nonetheless by suing Florida under the Civil Rights of Institutionalized Persons Act ("CRIPA"), a separate federal statute that authorizes the Attorney General to sue a state when it "subject[s] persons residing in or confined to an institution . . . to egregious or flagrant conditions" and "caus[es] such persons to suffer grievous harm." 42 U.S.C. § 1997a(a).

But as the panel majority carefully explained, the Attorney General could not have sued Florida under CRIPA because the facilities where the children are placed do not appear to meet CRIPA's definition of "institution." See Florida, 938 F.3d at 1246 n.23. Under CRIPA, a "skilled nursing, intermediate or long-term care, or custodial or residential care" facility generally qualifies as an institution if it is "owned, operated, or managed by, or provides services on behalf of any State or political subdivision of a State." 42 U.S.C. § 1997(1), (B)(v). A privately owned and operated facility does not qualify as an institution when its "nexus" with the state is limited to state licensing of the facility and the facility's receipt of payments under Medicaid, Medicare, or Social Security. Id. § 1997(2). As the panel majority noted, a review of the record in this case indicates that the facilities housing the medically-fragile children were privately owned and operated and thus did not qualify as institutions under CRIPA. Florida, 938 F.3d at 1246 n.23.

In any event, even if the Attorney General also could sue Florida under CRIPA, "[t]here is nothing to suggest that CRIPA was intended to be the only means of enforcing the rights of institutionalized persons." Id. (emphasis omitted). Congress enacted the ADA ten years after CRIPA. Despite CRIPA's existence, Congress found that discrimination against individuals with disabilities "persist[ed]" in "critical areas" including via their "institutionalization." See 42 U.S.C. § 12101(a)(3); Olmstead, 527 U.S. at 599–600.

### IV.    Contrary to the Dissental's Claim, the Panel Opinion Does Not Conflict with Federalism Principles.

Before concluding, I must address one last criticism the dissental levels against the panel majority's opinion. The dissental says that the opinion's holding "comes at [a] real cost to core principles of federalism." Dissental at 61. This critique flows from the dissental's assumption that the ADA does not authorize the Attorney General to sue a public entity when it receives no federal funding and thus that the panel majority opinion "creates a nonexistent cause of action." *Id.* at 41, 64.

But if the panel majority was correct that Congress intended to authorize the Attorney General to sue to enforce Title II's prohibition on discrimination against all public entities, regardless of whether they receive federal funding, then the majority opinion "creates" no cause of action and presents no federalism concerns. If so, the dissental's critique amounts to a policy argument about why Congress should not have decided to authorize the Attorney General to sue a state government to enforce federal law. Because Congress acted and authorized the Attorney General to sue, however, adopting the dissental's interpretation would violate principles of separation of powers by taking away from the Attorney General power the considerable authority that Congress gave

38        JILL PRYOR, J., respecting denial of reh'g en banc 17-13595

him.[12] *Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1300–01 (11th Cir. 2010) ("Courts may not rewrite the language of a statute in the guise of interpreting it in order to further what they deem to be a better policy than the one Congress wrote into the statute.").

## V.    Conclusion

The panel majority got the law right. In Title II of the ADA, Congress authorized the Attorney General to sue any public entity, regardless of whether it receives federal funding, to enforce the statute. Reading the broad statutory language in its proper context, the panel correctly held that the Attorney General was authorized in this case to sue the State of Florida, on behalf of the medically-fragile children, for disability discrimination.

---

[12] Judge Newsom does not dispute that Congress has the authority under the Constitution to authorize the Attorney General to enforce Title II against state governments even when they receive no federal funding.

NEWSOM, Circuit Judge, dissenting from the denial of rehearing en banc, in which BRANCH, Circuit Judge, joins:

## I

This case involves the Americans with Disabilities Act. Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Tennessee v. Lane*, 541 U.S. 509, 516 (2004) (quoting 42 U.S.C. § 12101(b)(1)). The Act contains three titles: Title I covers employment; Title II covers public services, programs, and activities; and Title III covers public accommodations. *See id.* at 516–17. Our focus here is Title II—and, specifically, the question whether the Attorney General of the United States can sue to enforce it. As background—much more on this later—Title II's enforcement provision states in full:

> The remedies, procedures, and rights set forth in section 794a of Title 29 [*i.e.*, § 505 of the Rehabilitation Act of 1973] shall be the remedies, procedures, and rights this subchapter [*i.e.*, Title II] provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title.

42 U.S.C. § 12133.

⋆ ⋆ ⋆

Briefly, the specifics of this case: The allegations here—that the State of Florida has mistreated children with severe medical conditions and disabilities—are extremely serious. In particular, in

a Letter of Findings, the DOJ informed Florida that it was violating Title II by "unnecessarily institutionalizing hundreds of children with disabilities in nursing facilities." *United States v. Florida*, 938 F.3d 1221, 1224 (11th Cir. 2019). The DOJ further alleged that Florida's Medicaid policies put some children—those who are "medically fragile" or who have "medically complex" conditions—"at risk of unnecessary institutionalization." *Id.* at 1225. After failed negotiations, the DOJ sued Florida, seeking declaratory and injunctive relief under Title II. *See id.* The district court consolidated the government's case with a class action brought on behalf of children alleging similar claims against the state. *See id.* Ultimately, that court dismissed the government's case, holding that the Attorney General lacked standing to sue under Title II. *C.V. v. Dudek*, 209 F. Supp. 3d 1279, 1282 (S.D. Fla. 2016), *rev'd and remanded sub nom.*, *United States v. Florida*, 938 F.3d 1221.

In a split decision, a panel of this Court reversed. The panel majority zeroed in on the "remedies, procedures, and rights" language in Title II's enforcement provision. Because Title II references § 505 of the Rehabilitation Act of 1973, which in turn references Title VI of the Civil Rights Act of 1964, the panel concluded that Title VI is the "ultimate fount of the cascade of cross-references"—and thus effectively "the enforcement mechanism for Title II." *United States v. Florida*, 938 F.3d at 1227, 1229. Section 602 of Title VI allows the government to "effect" compliance with that statute by (1) terminating or refusing to grant funds; or (2) "by any other means authorized by law." *Id.* at 1227 (quoting 42 U.S.C.

§ 2000d-1).  The phrase "any other means authorized by law," the panel held, encompassed lawsuits by the Attorney General.  *Id.* at 1233.  Because Title II's "remedies, procedures, and rights" language "adopt[ed] federal statutes" that contemplate enforcement and suit by the Attorney General, the majority reasoned—having spent dozens of pages untangling the cross-reference "cascade"—that the Attorney General can likewise sue under Title II.  *Id.* at 1229, 1250.  For reasons I'll explain, I disagree.

The panel's opinion can plausibly be understood in either of two ways—neither of which, I hope to show, withstands scrutiny.  First, one might read the opinion to hold that the Attorney General is himself a "person alleging discrimination" within the meaning of 42 U.S.C. § 12133 and, accordingly, has standing to sue under Title II.  If that's what the panel's opinion means, then for many of the reasons that Judge Branch identified in her dissent—and that I'll aim to underscore here—it seems to me flat wrong.  *See United States v. Florida*, 938 F.3d at 1251–54 (Branch, J., dissenting).  Second, and perhaps more charitably, the majority's opinion might be read to hold that the Attorney General has standing to sue on behalf of *other* "person[s] alleging discrimination" under Title II.  While that reading avoids many of the more obvious pitfalls identified by Judge Branch, I contend that it fails just the same.

Because the panel's decision creates a nonexistent cause of action, vests the federal government with sweeping enforcement authority that it's not clear Congress intended to give, and, in the doing, upends the delicate federal-state balance, this Court should

have reheard it en banc.  I respectfully dissent from its refusal to do so.

## II

I begin with the first possible reading of the panel opinion—that the Attorney General has standing to sue to enforce Title II of the ADA because he is, within the meaning of that statute's remedial provision, a "person alleging discrimination."   42 U.S.C. § 12133.  As Judge Branch explained in her dissent, the Supreme Court's recent decision in *Return Mail, Inc. v. U.S. Postal Service*, 139 S. Ct. 1853 (2019), all but forecloses that theory.

The question in *Return Mail* was "whether a federal agency is a 'person' able to seek" administrative review and to challenge the validity of a patent (post-issuance) under the Leahy-Smith America Invents Act.  139 S. Ct. at 1858–59.  In a 6–3 decision authored by Justice Sotomayor, the Supreme Court held that the agency was *not* a "person."  *Id.* at 1859.  In arriving at that conclusion, the Court began with the "longstanding interpretive presumption that 'person' does not include the sovereign."  *Id.* at 1861–62 (citing cases dating back nearly 150 years).  The presumption doesn't just reflect "common usage," the Court explained, but "is also an express directive from Congress" because the Dictionary Act, 1 U.S.C. § 1, supplies the definition of "person" that courts should use in "determining the meaning of any Act of Congress, unless the context indicates otherwise."  *Id.* at 1862 (quoting 1 U.S.C. § 1).  "Notably absent from the list of 'person[s]'" in the Dictionary Act, the Court emphasized, "is the Federal Government."

*Id.* (alteration in original) (citation omitted). The Court further confirmed that the presumption applies even when it operates, in effect, to "exclude the Federal Government or one of its agencies from accessing a benefit or favorable procedural device." *Id.* (citing *United States v. Cooper Corp.*, 312 U.S. 600, 604–05 (1941), which held that the United States is not a "person" who can sue under the Sherman Antitrust Act for treble damages).

The *Return Mail* Court explained that while the presumption isn't a "hard and fast rule of exclusion," it can be "disregarded" only if there is "some indication in the text or context of the statute that affirmatively shows Congress intended to include the government." *Id.* at 1862–63 (citations and quotations omitted). So back to our case, are there any presumption-defeating indicators in the text or context of Title II's enforcement provision—or the ADA more generally—that affirmatively show that Congress intended to include the Attorney General (in his capacity as representative of the United States) within the meaning of the phrase "any person alleging discrimination"? There are not. Quite the opposite, in fact. Title II's enforcement provision—particularly when understood in the ADA's larger context—confirms that the Attorney General is *not* covered.

Notably, Congress explicitly gave the Attorney General standing to sue under Titles I and III of the ADA. In full, Title I's enforcement provision, which addresses discrimination in employment, expressly authorizes the Attorney General to sue, and does so *separately* from "any person alleging discrimination":

> The powers, remedies, and procedures set forth in . . . this title shall be the powers, remedies, and procedures this subchapter [*i.e.*, Title I] provides to the Commission, to the *Attorney General*, or to *any person alleging discrimination* on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment.

42 U.S.C. § 12117(a) (emphasis added).

Title III's enforcement provision, which addresses discrimination in public accommodations, is structured a bit differently, but it too clearly vests the Attorney General with authority to sue. It initially provides "remedies and procedures . . . to *any person* who is being subject to discrimination on the basis of disability in violation of [Title III]." *Id.* § 12188(a)(1) (emphasis added). It goes on, though, to provide explicitly—and separately—for enforcement by the Attorney General. In particular, it gives the Attorney General a duty to "investigate alleged violations" of Title III and to "undertake periodic reviews of compliance" with Title III, *id.* § 12188(b)(1)(A)(i), as well as permission to "certify that a State law or local building code or similar ordinance that establishes accessibility requirements meets or exceeds the minimum requirements of" the ADA, *id.* § 12188(b)(1)(A)(ii). Most importantly here, it gives the Attorney General an express right to sue to enforce Title III:

> If the Attorney General has reasonable cause to believe that—(i) any person or group of persons is engaged in a pattern or practice of discrimination under this subchapter [*i.e.*, Title III]; or (ii) any person or group of persons has been discriminated against under this subchapter [*i.e.*, Title III] and such discrimination raises an issue of general public importance, *the Attorney General may commence a civil action* in any appropriate United States district court.

*Id.* § 12188(b)(1)(B) (emphasis added).

The fact that Titles I and III reference the Attorney General by name and, more to the point, expressly authorize him to sue, tells us (at least) two things about the way Congress drafted the ADA. *First*, the Attorney General is not included within the term "person" under Titles I and III—otherwise why mention the "Attorney General" in addition to and alongside the word "person"? *See, e.g.*, *Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1058 (2019) (explaining that courts should be "hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law" (quotation omitted)). And because courts have a "duty to construe statutes, not isolated provisions," and, therefore, should ordinarily follow the "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 568, 570 (1995), if the term "person" doesn't include the Attorney General in Titles I or III, then it doesn't include the Attorney General in Title II, either.

*Second*, Titles I and III show that when Congress intended the Attorney General to have enforcement power under the ADA, *it said so*. This is consistent with the Supreme Court's observation that "the United States Code displays throughout that when an agency in its governmental capacity *is* meant to have standing, Congress says so." *Dir., Off. of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 129 (1995). In *Newport News*, the Supreme Court considered whether the Director of the Office of Workers' Compensation Programs in the U.S. Department of Labor had standing to appeal decisions of the Benefits Review Board under the Longshore and Harbor Workers' Compensation Act, which allowed a "person adversely affected or aggrieved" to appeal. *Id.* at 123, 126 (quoting 33 U.S.C. § 921(c)). The Court emphasized that the Act's "silence regarding the Secretary's ability to take an appeal is significant when laid beside other provisions of law"—such as the Black Lung Benefits Act, Title VII of the Civil Rights Act of 1964, and the Employee Retirement Income Security Act of 1974—that mentioned the agency or agency head by name. *Id.* at 129–30. The inference that follows from comparing the enforcement provision in Title II of the ADA to those in Titles I and III is even stronger, as all three provisions are located *within the same statute*. Where "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (quotation omitted).

Lastly, there are "good reasons" here—of the sort the Supreme Court deemed significant in *Return Mail*—why Congress might have wanted the Attorney General to be able to sue under Titles I and III, but not Title II. *See* 139 S. Ct. at 1866. Whereas Titles I and III apply predominantly to private defendants—employers and providers of public accommodations, respectively—Title II regulates every service, program, and activity administered by every state in the country. Accordingly, as I'll explain in greater detail shortly, Title II enforcement could bring the federal and state governments into broad-scale conflict in a way that suits under Title I and III would not. And to be clear, a holding that the Attorney General can't sue under Title II wouldn't mean that its provisions would go unenforced or that its purposes would go unaccomplished. Congress clearly gave private parties the ability to sue under Title II, and the Attorney General has long had explicit authority to enforce the Civil Rights of Institutionalized Persons Act against the states in this space. *See* 42 U.S.C. § 1997a(a).

The panel largely sidestepped both *Return Mail* and the presumption against treating the government as a statutory "person." Its lengthy opinion mentioned *Return Mail* only once—in a brief footnote. There, the panel concluded that *Return Mail* wasn't applicable because the statute at issue in that case "differ[ed] significantly from the complex 'remedies, procedures, and rights' structure of the ADA." *United States v. Florida*, 938 F.3d at 1227 n.5. For my part, I don't think *Return Mail*—or the more than 100 years of Supreme Court precedent on which it rests—is so easily

shrugged off.  No matter how "complex" the "remedies, proce-dures, and rights" provided for in Title II may be, they apply only to a "person alleging discrimination."  It seems absolutely clear to me that the Attorney General doesn't fit that description, and to the extent that the panel opinion is meant to hold otherwise, it is plainly erroneous.

## III

Which leads me to a second, and perhaps more charitable, reading of the panel's opinion—namely, that it means to hold *not* that the Attorney General is himself a "person alleging discrimina-tion" within the meaning of Title II's enforcement provision but, rather, that the Attorney General has standing to sue on behalf of *other* "person[s] alleging discrimination."  It's worth noting at the outset that this interpretation is in pretty stark tension with the government's own briefing in the case, which emphasized that "[w]hen the Attorney General files a Title II lawsuit, he proceeds on behalf of the United States—not as the attorney for any individ-ual complainant."  Reply Br. of United States at 5.  But I'll leave that aside for present purposes.  Even on its own terms, the contention that Title II authorizes the Attorney General to sue to vindicate others' statutory rights comes up short.

Explaining why that's so will require a bit of unpacking, but here's the short story:  Title II's remedial provision, to which I've already alluded and whose terms I'll revisit shortly, does not itself create a cause of action authorizing the Attorney General, or the federal government more generally, to sue.  Rather, by virtue of its

incorporation of the remedies provided by the Rehabilitation Act of 1973, which in turn incorporates the remedies provided by the Civil Rights Act of 1964—more on the cross-references below—Title II directs courts to look elsewhere for a cause of action that is "authorized by law." And yet no one—neither the government in its briefs nor the panel in its opinion—has pointed to a valid source of law that gives the federal government a cause of action to sue for violations of Title II. Instead, so far as I can tell, the Rehabilitation Act and Title VI precedents cited by the government and the panel—which I'll explore in detail—support only the much more limited proposition that the federal government can sue *federal-funding recipients for breach of contract*. While those precedents seem to me correct as far as they go, they don't go nearly far enough. In particular, they don't move the needle where, as here, the government's suit isn't predicated on the violation of any contractual funding condition embedded in a Spending Clause statute.

At the end of the day, there simply is no cause of action authorizing the government's *non*-contract suit here. And we aren't at liberty to conjure one, no matter how sympathetic the plaintiffs' case. *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001) (explaining that without clear evidence of congressional intent, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute").

## A

I start, as promised, with the text of the pertinent provisions. Title II of the ADA gives to any "person alleging discrimination"—which for present purposes I'll assume is an individual on whose behalf the Attorney General is suing—the remedies provided by the Rehabilitation Act. In particular, Title II's remedial provision states that

> [t]he remedies, procedures, and rights set forth in [the Rehabilitation Act's remedial provision] shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of [Title II].

42 U.S.C. § 12133. The Rehabilitation Act, in turn, confers the remedies provided by Title VI of the Civil Rights Act. In particular, the Rehabilitation Act's remedial provision states that

> [t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 . . . shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal providers of such assistance under . . . this title.

29 U.S.C. § 794a(a)(2). And finally, Title VI's remedial provision states that

> [c]ompliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom

there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement . . . or (2) by any other means authorized by law.

42 U.S.C. § 2000d–1. Accordingly, by dint of Title II's incorporation of the Rehabilitation Act's incorporation of Title VI's remedies, there are two methods by which a plaintiff can seek to "effect[]" compliance with Title II: (1) "termination" (or refusal) of federal funding; and (2) "any other means authorized by law."

All here agree that this case has nothing to do with the termination of federal funding. The controlling question, therefore, is whether the Attorney General's suit here to enforce Title II constitutes an "other means authorized by law." Title VI's reference to funding termination, though, hints at the mismatch that plagues, and ultimately defeats, the panel's opinion—or, more particularly, the alternative reading of it that I'm presently assessing. Title VI, in which the funding-termination and "any other means authorized by law" remedies originate, was enacted pursuant to Congress's Spending Clause power. *See Barnes v. Gorman*, 536 U.S. 181, 185 (2002). So was the Rehabilitation Act. *See id.* at 189 n.3. Problematically for the panel opinion—for reasons I will explain in detail—Title II of the ADA was not.

The statutory phrase "*other means* authorized by law"—included in Title VI and incorporated by reference into Title II—requires us to ask whether, in the absence of the statute, *something else* would sanction the proposed "means." This case, accordingly,

turns on whether a government-brought action to remedy an alleged Title II violation is *elsewhere* "authorized by law." It is not.

In our legal system, a lawsuit is "authorized by law"—greenlighted, in essence—via a cause of action. Sometimes, a cause of action arises from the common law—an action for tort, breach of contract, etc. Just as often, a cause of action is created by a statute. When Congress wants to "authorize[]" the Attorney General to sue violators of a statute outside of the common law, it creates an express cause of action empowering him to do so. And perhaps not surprisingly, it does so pretty routinely. *See, e.g.*, 18 U.S.C. § 216(b) ("The Attorney General may bring a civil action in the appropriate United States district court against any person who engages in conduct constituting an offense under . . . this title and . . . such person shall be subject to a civil penalty of [damages]."); 18 U.S.C. § 1345(a)(1)(C) (authorizing "the Attorney General" to "commence a civil action in any Federal court to enjoin [a] violation"); 20 U.S.C. § 1706 ("The Attorney General of the United States . . . for or in the name of the United States, may . . . institute . . . a civil action on behalf of [an] individual [denied an equal educational opportunity].").

Here, though, no such cause of action exists. No one has directed our attention to a common-law or statutory cause of action "authoriz[ing]" the federal government to sue for a violation of Title II. Congress did not create a cause of action, for instance—à la *any* of the statutes just cited—empowering the Attorney General to "institute a civil action on behalf of an individual who claims to have been the victim of discrimination."

## B

Where, then, did the panel find the requisite "authoriz[ation]"? Seemingly, in analogies to cases in which courts have affirmed the federal government's common-law cause of action to sue under Title VI and the Rehabilitation Act—Title II's (step) sister statutes—for breach of contract. But therein lies the problem, because the analogy doesn't hold up.

It is well-settled that the common law authorizes the federal government to sue funding recipients for violating conditions attached to their receipt of federal funds. *See, e.g.*, *McGee v. Mathis*, 71 U.S. (4 Wall.) 143, 155 (1866). The grant of funds from the "United States to the State upon conditions, and the acceptance of the grant by the State, constitute[s] a contract," as it includes "competent parties, proper subject-matter, sufficient consideration, and consent of minds." *Id.* Statutes that impose conditions on federal funds—*i.e.*, Spending Clause statutes—thereby create contractual obligations, which means that the federal government can sue when those obligations aren't met. "When a federal-funds recipient violates conditions of Spending Clause legislation," the Supreme Court has explained, "the wrong done is the failure to provide what the contractual obligation requires; and that wrong is 'made good' when the recipient *compensates* the Federal Government . . . for the loss caused by that failure." *Barnes*, 536 U.S. at 189. But because this widely recognized cause of action comes

from the common law of contracts, it authorizes suit only for—and upon—a breach of contract.  *See McGee*, 71 U.S. at 155.[1]

As already noted—but the point bears repeating—while Title VI and the Rehabilitation Act are Spending Clause statutes, the ADA is not.  And, therefore, not surprisingly, the federal government here does not allege that any sort of funding relationship existed between it and the State of Florida, nor does it allege that Florida violated any conditions attached to any federal funds.  Instead, the government alleges a bare violation of Title II—without any contentions regarding a meeting of the minds, consideration, or any other aspect of contract formation or performance.

---

[1] The Supreme Court has acknowledged that the cause of action against funding recipients may not be governed by contract law in all respects—sometimes saying, for instance, that contract law provides the governing "analogy." *See, e.g.*, *Sossamon v. Texas*, 563 U.S. 277, 290 (2011) ("We have acknowledged the contract-law analogy, but we have been clear not [to] imply . . . that suits under Spending Clause legislation are suits in contract, or that contract-law principles apply to all issues that they raise.") (alterations in original) (quotation marks omitted)).  But the Court has made this point only to suggest that the cause of action against funding recipients may be in some respects even more limited in scope than contract law would indicate. *See id.* at 290 (noting that past cases had invoked a contract analogy for the Spending Clause "only as a potential *limitation* on liability"); *Barnes*, 536 U.S. at 186–87 (although not "all contract-law rules apply to Spending Clause legislation," contract law operates to limit "the scope of conduct" giving rise to liability and the "scope of damages remedies" available (emphasis omitted)).  And as particularly relevant here, the Court has clarified that "[w]e have not relied on the Spending Clause contract analogy to *expand* liability beyond what would exist under nonspending statutes." *Sossamon*, 563 U.S. at 290 (emphasis added).

Accordingly, it seems clear beyond peradventure that the government has no cause of action in this case based in contract-law principles.

So far as I can tell, *all* of the binding precedent concerning the trio of statutes that (either directly or by adoption) use the term "other means authorized by law" demonstrates that the federal government's right to sue violators of those statutes is rooted in—and limited by—contract principles. To begin, this Circuit has long recognized that the government can sue federal-funding recipients under the Rehabilitation Act—again, a Spending Clause statute—given the "contractual relationship" that attaches to "conditions of accepting federal monies disbursed under the spending power." *United States v. Bd. of Trustees for Univ. of Ala.*, 908 F.2d 740, 750 (11th Cir. 1990). We have similarly held that the government's right to sue under Title VI—based on that statute's status as a "contractual spending power provision"—does not extend to programs and activities not receiving federal funding. *United States v. Alabama*, 828 F.2d 1532, 1547–51 (11th Cir. 1987) (quotation marks omitted). In the same vein, our predecessor court held that the federal government can sue funding recipients under Title VI because of its "right to sue to enforce its contracts." *United States v. Marion Cnty. Sch. Dist.*, 625 F.2d 607, 611 (5th Cir. 1980). Notably, the court in that case emphasized that the federal government's claims, which it allowed to proceed, "were not intended to be asserted as independent causes of action, only as subsidiary to the contract claim," *id.* at 609 n.3, and it made clear that it was not

56                    NEWSOM, J., Dissenting                    17-13595

"pass[ing] on the question" of whether the United States had an "implied right of action under Title VI," *id.* at 616–17.[2]  In just the same way, decisions from other circuits seem to recognize only causes of action that arise out of contractual relationships.[3]

---

[2] *Camenisch v. Univ. of Texas*, 616 F.2d 127 (5th Cir. 1980), and *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161 (11th Cir. 2003), both of which the panel cited, are inapposite, as both concerned lawsuits initiated by private parties. *United States v. Fordice* also concerned a lawsuit initiated by a private party, and the federal government's intervention into the case was justified by a concern about federal funding.  *See* 505 U.S. 717, 722 n.1, 723–24 (1992).

[3] The Fifth Circuit decisions cited in the panel opinion held that the federal government can sue federal-funding recipients under the Rehabilitation Act for termination of funding, based on the funding recipient's "contractual assurance that it would comply with Section 504." *United States v. Baylor Univ. Med. Ctr.*, 736 F.2d 1039, 1041 (5th Cir. 1984); *accord United States v. Harris Methodist Fort Worth*, 970 F.2d 94, 104 (5th Cir. 1992) (referring to enforcement of Title VI against funding recipients).  The Eighth Circuit decision cited there concerned a suit brought by the federal government against a funding recipient.  *See United States v. Lovett*, 416 F.2d 386, 387 (8th Cir. 1969).  So too, the Second Circuit decision cited in the opinion concerned a suit brought by the federal government against a funding recipient seeking the disclosure of medical records.  *See United States v. Univ. Hosp., State Univ. of N.Y. at Stony Brook*, 729 F.2d 144, 148 (2d Cir. 1984).  And the Sixth Circuit decision cited there—a case under the Family Education Rights and Privacy Act's analogous provision allowing "any other action authorized by law"—held that the United States' right to sue "in the absence of statutory authority" applies to "Spending [C]lause legislation, when knowingly accepted by a fund recipient," and where the suit seeks to "enforce conditions imposed on the recipients of federal grants." *United States v. Miami Univ.*, 294 F.3d 797, 808 (6th Cir. 2002).  The other six circuit-level decisions cited in the panel opinion—*National Black Police Ass'n, Inc. v. Velde*, 712 F.2d 569 (D.C. Cir. 1983); *Brown v. Califano*, 627 F.2d 1221 (D.C. Cir. 1980); *Miener v. Missouri*, 673 F.2d 969 (8th Cir. 1982);

17-13595              NEWSOM, J., Dissenting              57

Accordingly, the relevant caselaw identifies and concerns a cause of action that has no application under the circumstances of this case.  The cases instead follow the logic of the particular statutory schemes that underlie them and support the conclusion that the government's cause of action is limited to suits authorized by principles of contract.  Because the ADA isn't a Spending Clause statute, their logic just doesn't translate.

## C

Briefly, a few words in response to Judge Jill Pryor's thoughtful opinion concurring in the denial of rehearing en banc.

*First*, Judge Pryor asserts that my reading of Title II contradicts clues that we can discern from "the entire statutory scheme

---

*Pushkin v. Regents of Univ. of Colo.*, 658 F.2d 1372 (10th Cir. 1981); *Kling v. County of Los Angeles*, 633 F.2d 876 (9th Cir. 1980); and *NAACP v. Med. Ctr., Inc.*, 599 F.2d 1247 (3d Cir. 1979)—all concerned suits brought by private plaintiffs.

So far as I can tell, only four courts ever—all district courts—have said that either Title II, the Rehabilitation Act, or Title VI creates a freestanding cause of action for the federal government without regard to whether a contractual relationship existed.  One did so in dicta, *see United States v. Frazer*, 297 F. Supp. 319, 322–23 (M.D. Ala. 1968), two said that such a suit could proceed only upon referral from a "funding agency," *see United States v. City & Cty. of Denver*, 927 F. Supp. 1396, 1400 (D. Colo. 1996); *United States v. Virginia*, No. 12-cv-00059, 2012 WL 13034148 at *2–3 (E.D. Va. June 5, 2012), and the fourth thought the federal government's freestanding cause of action followed from "the plain language of [Title II] itself," without any external "authoriz[ation] by law," *see United States. v. Harris Cty.*, No. 16-cv-02331, 2017 WL 7692396 at *1 (S.D. Tex. Apr. 26, 2017).  I'm not persuaded.

in context." Pryor Conc. Op. at 5, 8, 21–33. In particular, she says, Title II was meant to "fill the gap" left by the Rehabilitation Act—a Spending Clause statute—"by expanding the prohibition on disability discrimination to all state governmental entities, regardless of whether the state program or activity said to be discriminatory receives federal funding." *Id.* at 24. In short, because Congress enacted Title II to "remedy th[e] inadequacy" of the Rehabilitation Act's limited application to funding recipients, it must have intended Title II to have a broader reach. *Id.* at 23. And so, she concludes—and this is where the rubber really meets the road—Title II must be understood to authorize the Attorney General to bring a lawsuit against any public entity, regardless of whether it receives federal funding. *Id.* at 22. With respect, I just don't think that Judge Pryor's conclusion follows from her premises.

I quite agree that Congress intended the ADA to have a broader scope than the Rehabilitation Act. To that end, as Judge Pryor repeatedly says, Congress "extended the scope of protection afforded to individuals with disabilities by prohibiting any program run by a public entity from engaging in disability discrimination," regardless of whether it receives federal funding. *Id.* at 11 (emphasis omitted); *see also, e.g., id.* at 22, 23, 24, 26 n.6. To be precise, the ADA newly imposed substantive liability on "any State or local government," without regard to funding status. 42 U.S.C. § 12131. It then carried over the "remedies" and "rights" available under Title VI of the Civil Rights Act, which we all agree include a *private* cause of action against non-funding-recipients. *Id.* § 12133; *see also*

*Barnes*, 536 U.S. at 185. It then went even further and newly imposed liability on employers and places of public accommodation. *See* 42 U.S.C. § 12111–12117; *id.* § 12181–12189. So if Congress intended to "extend[] the scope of protection" against disability discrimination through the ADA, mission accomplished. But it doesn't follow from that "exten[sion]" that Congress gave the federal government the authority to sue. We might wish that Congress had taken that last step, but it undoubtedly has the prerogative to proceed moderately. "[N]o legislation pursues its purposes at all costs." *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987) (per curiam).

In any event, a statute's perceived "context" can't override its plain text. By its express terms, Title II gives the federal government no more enforcement authority than it has under Title VI—namely, a contract-based cause of action applicable only to funding recipients. It may be that Congress "just stubbed its toe" in the drafting process and failed to confer on the federal government a more general right to sue, but even if that's the case, "it's not our place or prerogative to bandage the resulting wound." *CRI-Leslie, LLC v. Comm'r of Internal Revenue*, 882 F.3d 1026, 1033 (11th Cir. 2018).

*Second*, and separately, Judge Pryor contends that my reading of Title II "conflicts with Supreme Court precedent." Pryor Conc. Op. at 33. In particular, she says, my interpretation can't be squared with *NCAA v. Smith*, 525 U.S. 459 (1999). In that case, a private plaintiff sued the NCAA under Title IX, which prohibits

discrimination by educational programs "receiving Federal financial assistance." 20 U.S.C. § 1681(a).  The Supreme Court considered "whether a private organization that does not receive federal financial assistance"—*i.e.,* the NCAA itself—"is subject to Title IX because it receives payments from entities that do"—*i.e.,* its constituent schools. *Id.* at 465.  The Court held that because the NCAA didn't receive federal financial assistance, it wasn't subject to Title IX. *Id.* at 468.  In a footnote, it addressed the plaintiff's alternative argument that, because she was a private citizen, the words "receiving Federal financial assistance" in Title IX might be interpreted more loosely. *Id.* at 467 n.5.  The Court quickly dispatched that contention:  "[I]t would be anomalous to assume that Congress intended the implied private right of action to proscribe conduct that Government enforcement may not check." *Id.*

I take the Court to have meant only that a private cause of action can't of its own force expand the scope of liability beyond the plain terms of the statute, not—as Judge Pryor suggests—that the existence of a private right of action necessitates a corresponding government cause of action, regardless of whether the statute authorizes it. *See* Pryor Conc. Op. at 35.  Congress, of course, can decide whether any given statutory right will be enforced by private plaintiffs, the federal government, or both. *See, e.g., Dir., Off. of Workers' Comp.*, 514 U.S. at 129.  And more fundamentally, our law is now clear that "[r]aising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals." *Alexander*, 532 U.S. at 287.

## IV

So it seems to me that on either reading of its opinion, the panel's decision is wrong.  It also, I fear, comes at real cost to core principles of federalism.  The Supreme Court has recognized that "our Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991); *see also* The Federalist No. 39, at 242 (James Madison) (Clinton Rossiter ed., 1961) (stating that states retain "a residuary and inviolable sovereignty").  The incidents and benefits of the federal system are well-rehearsed, and there's no point in re-rehearsing them here.  Suffice it to say that while "[t]he actual scope of the Federal Government's authority with respect to the States has changed over the years, . . . the constitutional structure underlying and limiting that authority has not," *New York v. United States*, 505 U.S. 144, 159 (1992), and that the "separation of the two spheres is one of the Constitution's structural protections of liberty." *Printz v. United States*, 521 U.S. 898, 921 (1997); *see also Gregory*, 501 U.S. at 458 ("[A] healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front.").

The upshot of the panel's holding is that the Attorney General can enforce Title II of the ADA by suing state governments.  That's a big deal.  To see why, one need look no further than Georgia's settlement agreement with the Department of Justice in a similar case.  *See* Joint Motion to Enter the Parties' Settlement Agreement (Ex. A), *United States v. Georgia*, No. 1:10-cv-00249-CAP

(N.D. Ga. filed October 19, 2010) [hereinafter Georgia Settlement Agreement]. Without admitting to any of the alleged wrongdoing, Georgia agreed to numerous substantive policy changes governing how it would serve those with developmental disabilities and mental illness. *See* Georgia Settlement Agreement at 5–25. Georgia also agreed to allow an independent reviewer to determine—at state expense—its compliance with the settlement. *See id.* at 27, 30–31 (providing that the state must maintain a fund containing at least $100,000 from which payments for the reviewer would be withdrawn). Additionally, the agreement gave the United States "full access" to any persons, records, or materials "necessary to assess the State's compliance." *Id.* at 27.

Georgia's settlement agreement demonstrates the result of allowing the Attorney General to enforce Title II—namely, tilting the federal balance decisively in favor of the federal government. The panel's opinion, by sanctioning the Attorney General's enforcement of Title II, could force other public entities (like Georgia and Florida) to make a choice either (1) to enter into settlement agreements, which not only impose monetary and resource costs but also lead to federal oversight of local policy decisions, or (2) to risk thousands (possibly millions) of dollars in litigation costs by disputing liability or terms of compliance.

None of this is to say, of course, that the DOJ's goals in enforcing Title II aren't laudable, or that Congress can't regulate states in seemingly local matters (or even provide for federal enforcement, through lawsuits or otherwise). *See, e.g.*, *Garcia v. San*

*Antonio Metro. Transit Auth.*, 469 U.S. 528, 555–56 (1985) (holding that Congress could, through the Commerce Clause, prescribe minimum wage and overtime rates under the Fair Labor Standards Act for a local transit system). In the ever-delicate federal-state balance, the Supremacy Clause gives the federal government "a decided advantage." *Gregory*, 501 U.S. at 460 (citing U.S. Const., art. VI, cl. 2). The point is simply that although the federal government holds the upper hand, the wielding of its federal power against the states cannot be taken lightly or casually inferred. *See id.* (stating that the ability of Congress to "legislate in areas traditionally regulated by the States . . . is an extraordinary power in a federalist system . . . that we must assume Congress does not exercise lightly"); *id.* at 464 ("[T]o give the state-displacing weight of federal law to mere congressional *ambiguity* would evade the very procedure for lawmaking on which *Garcia* relied to protect states' interests." (quoting Laurence H. Tribe, American Constitutional Law § 6–25, at 480 (2d ed. 1988))).

It's up to the judicial branch to uphold our constitutional structure by policing the limits of federal power. By reading Title II's enforcement provision to allow the Attorney General to subject Florida to suit and thereby regulate its provision of services to its residents, the panel's decision sanctions DOJ encroachment on Florida's sovereign prerogatives—*in the absence of any solid evidence that Congress intended such a result.* I don't quibble with the fact that Congress could regulate states in this regard if it

wanted to. But we must presume that Congress wouldn't do so lightly—and certainly not impliedly.

★  ★  ★

The question here is not whether Title II of the ADA *should* authorize the Attorney General to sue to enforce its terms but, rather, whether it *does*. And as I read the statute, it just doesn't. In concluding otherwise, the panel's opinion either flouts Supreme Court precedent, creates a nonexistent cause of action, or both— and, in the doing, skews the federal-state balance. I remain of the view that it is a mistake to allow the panel's decision to stand without reconsidering the important issues that it presents. Accordingly, I respectfully dissent from the Court's order denying en banc rehearing.